**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **UMAYMAH MOHAMMAD,**<br><br>*Plaintiff,*<br><br>v.<br><br>**EMORY UNIVERSITY;** and<br>**JOHN WILLIAM ELEY,**<br><br>*Defendants.* | CIVIL ACTION NO.:<br><br>1:25-cv-04321-AT<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**<br><br>JURY TRIAL DEMANDED |

1

## COMPLAINT FOR DAMAGES AND JURY DEMAND

Umaymah Mohammad ("**Plaintiff**"), by and through her undersigned counsel, brings this Complaint. She alleges the following against Emory University ("Emory") and Dr. John William Eley ("Dean Eley") (collectively, "**Defendants**"), and states as follows:

### I.    INTRODUCTION

1. Since October 7, 2023, the nation has seen a dramatic rise in anti-Muslim and anti-Palestinian sentiment. This trend has manifested on Emory's campus.

2. Plaintiff, Umaymah Mohammad, is a Muslim, Palestinian-American medical student who was suspended from Emory's School of Medicine ("SOM") after publicly expressing support for Palestinian human rights and criticizing discriminatory treatment at the university—speech protected under both Title VI of the Civil Rights Act of 1964 and Emory's own internal free speech policy.

3. While under investigation for her speech, including allegations of harassment and causing apprehension of harm, Plaintiff filed internal bias complaints. These complaints challenged both the fairness of the disciplinary proceedings and the conduct of the individual overseeing them, as well as the discriminatory enforcement of the SOM's bias reporting mechanism.

4. To halt Plaintiff's advocacy and punish her resistance to the SOM's discriminatory practices, Emory initiated a disciplinary process overseen by the

same person she had filed a complaint against. This process was plagued by procedural irregularities, such as pressuring Plaintiff to admit guilt, altering charges, manipulating deadlines, disregarding institutional policies, and imposing disproportionate sanctions.

5. On July 18, 2025, Plaintiff was informed of another alleged Code of Conduct violation, once again targeting her for the same protected speech that has previously led to unfair discipline.

6. This action seeks redress for violations of Plaintiff's civil rights under federal and state law, including intentional discrimination and retaliation in violation of Title VI of the Civil Rights Act of 1964, breach of contract, denial of procedural due process, and intentional infliction of emotional distress under Georgia law.

## II.   JURISDICTIONAL FACTS

### A. **The Plaintiff**

7. Ms. Mohammad is a Palestinian-American, Muslim resident of Georgia. She is an MD/PhD student at Emory, with an expected PhD completion date of 2027. She is currently under suspension from the SOM until the end of the 2027-2028 school year, and under probation until her graduation in 2029.

### B. **The Defendants**

8. Emory is a private university located in Atlanta, Georgia, and is chartered by the State of Georgia.

9. Dean Eley is the Executive Associate Dean of Medical Education and Student Affairs at the SOM, and is being named in his official capacity.

C. **Jurisdiction and Venue**

10. Emory receives federal financial assistance within the meaning of Title VI of the Civil Rights Act of 1964. Specifically, Emory participates in federal student aid programs and receives federal research and institutional grants from the U.S. Department of Education, the National Institutes of Health, and other federal agencies. As such, it is subject to the non-discrimination requirements of Title VI, 42 U.S.C. § 2000d, and its implementing regulations.[1]

11. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case arises under federal law, namely Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*.

12. All other claims fall under the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367, as all other claims are so related to the claims under

---

[1] *See Alexander v. Sandoval*, 532 U.S. 275 (2001) (Title VI creates a private right of action to sue for enforcement of nondiscrimination in covered programs and obtain injunctive relief and damages).

this Court's original jurisdiction that they form part of the same case or controversy.

13.  The Northern District of Georgia is the proper venue pursuant to 28 U.S.C. § 1391(b)(2), as Defendants are located in unincorporated DeKalb County, which is within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia. The events giving rise to this complaint occurred within unincorporated DeKalb County, which is within the district and divisional boundaries of the Atlanta Division of the Northern District of Georgia.

14.  The Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to 28 U.S.C. § 2201 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

### III.    FACTUAL ALLEGATIONS

A. **History of Discrimination at Emory University**

15.  On April 5, 2024, the Georgia chapter of the Council on American-Islamic Relations ("CAIR-Georgia") and Palestine Legal filed a Title VI complaint against Emory with the Department of Education's Office for Civil Rights ("OCR").[2]

---

[2] Letter from Sabiya Ahamed, Palestine Legal & Javeria Jamil, CAIR-Georgia, to Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Department of Education (Apr. 5, 2024) (Title VI Complaint Against Emory University), https://cairgeorgia.org/in-your-community/read-title-vi-complaint-against-emory-university-by-cair-georgia-and-palestine-legal/.

16.  The Title VI complaint alleges that Emory both allowed a hostile environment to persist on its campus and actively fostered discrimination against Palestinians and their allies following October 7, 2023, and throughout Israel's genocidal campaign in Gaza.[3]

17.  Emory disciplined Palestinian students and their allies who advocated for Palestinians in Gaza, while overlooking anti-Palestinian speech and dismissing student reports of harassment, threats, and doxxing (which involves publishing private personal information with malicious intent).

18.  The Title VI complaint was later amended to include additional allegations of anti-Palestinian discrimination based on Emory's response to non-violent pro-Palestinian encampments on campus. Emory escalated the situation by calling in local and state police, leading to violent arrests and physical assaults against students, faculty, and bystanders.[4]

---

[3] *See* Amnesty Int'l, *'You Feel Like You Are Subhuman': Israel's Genocide Against Palestinians in Gaza*, AI Index MDE 15/8668/2024 (Dec. 2024), https://amnesty.ca/wp-content/uploads/2024/12/Amnesty-International-Gaza-Genocide-Report-December-4-2024.pdf (comprehensive legal analysis concluding genocide is occurring under international law); Médécins Sans Frontières, *We Are Witnessing Israel Commit Genocide* (July 10, 2025), https://msf.org.uk/issues/gaza-genocide (medical humanitarian assessment of genocidal conditions).

[4] Timothy Pratt, et al., *Police Allegedly Use Rubber Bullets and Teargas at University Protest in Georgia*, THE GUARDIAN (Apr. 26, 2024, 2:41 AM), https://www.theguardian.com/us-news/2024/apr/25/emory-university-protest-arrests.

19.  On January 17, 2025, Emory unilaterally requested and entered into a Resolution Agreement with OCR.[5] Under the Resolution Agreement, which remains binding and enforceable, Emory agreed to three core obligations: (1) to revise all policies and procedures governing discrimination complaints and protest-related incidents; (2) to submit to OCR all discrimination complaints and Emory's corresponding responses; and (3) to provide formal training for students, employees, and campus law enforcement on anti-discrimination principles and the revised policies.

20.  Ms. Mohammad is unaware of any additional steps Emory has taken to comply with these requirements beyond updating their Respect for Open Expression policy[6]. The revised policy removes any reference to its supremacy when in conflict with other university policies; however, all claims in the current complaint relating to the Respect for Open Expression policy refer to a previous version that was authoritative at the time the allegations were made.

21.  On January 17, 2024, Ms. Mohammad used the SOM and MD/PhD listservs to criticize Emory's role in the Gaza conflict. Prior political speech on

---

[5] Office for Civil Rights Resolution Agreement with Emory University, Complaint No. 04-24-2178, (Jan. 15, 2025), https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/04242178-b.pdf.

[6] Emory Univ., *Policy 8.14: Open Expression Policy* (Mar. 20, 2025), https://emory.ellucid.com/pman/documents/view/19648/?security=c6f36f9de43a2c d25fc99614d09384f649a313cf.

these platforms, including anti-abortion and anti-Black remarks, had resulted in no disciplinary response. In contrast, on January 19, 2024, Executive Associate Dean Carlos Del Rio publicly referred to Ms. Mohammad as "unprofessional" in a school-wide email.

22. Over 200 students signed a statement of support for Ms. Mohammad, but some faculty members privately criticized the signers. Furthermore, Christian Hairston, Associate Dean of Student Success at the SOM, told Ms. Mohammad that residency directors were blacklisting her and another student, in an apparent intimidation tactic to suppress her activism for Palestinians.

23. Finally, while Emory took no action to protect Ms. Mohammad from doxxing and safety threats, administrators indicated that potential expulsion for her pro-Palestine activism remained under consideration, stating the "conversation had not been had yet."

B. *Democracy Now!* **Interview**

24. *Democracy Now!* is an independent, publicly broadcast global news hour that provides "breaking daily news headlines and in-depth interviews with people on the front lines of the world's most pressing issues."[7]

---

[7] *About Democracy Now!*, DEMOCRACY NOW!, https://www.democracynow.org/about (last accessed: July 14, 2025).

25. On April 26, 2024, Ms. Mohammad participated in an interview with *Democracy Now!* focusing on the pro-Palestine student encampments taking place across the United States. She highlighted the stark disparity in how universities, including Emory, treat students advocating for Palestinian liberation compared to those supporting Israel's supposed right to continue its genocidal campaign against the Palestinian people.[8]

26. During her interview, Ms. Mohammad discussed, without naming, an SOM faculty member and his voluntary service as a reserve doctor with the Israel Defense Forces ("IDF") at the same time they conducted their genocidal campaign against Palestinians.

27. While speaking on this topic, Ms. Mohammad made the following statement:

> So, a great example of this is very early on [in] this genocide, in October, Emory fired a Palestinian physician for posting a private social media post on her Facebook in support of the Palestinians. And yet one of the professors of medicine we have at Emory recently went to serve as a volunteer medic in the Israeli Offense Force and recently came back. This man participated in aiding and abetting a genocide, in aiding and abetting the destruction of the healthcare system in Gaza and the murder of over 400 healthcare workers and is now back at Emory so-called teaching medical students and residents how to take care of patients.[9]

---

[8] *Atlanta Police Violently Arrest Emory Students & Faculty to Clear Gaza Solidarity Encampment*, DEMOCRACY NOW!, at 20:11 (Apr. 26, 2024), https://www.democracynow.org/2024/4/26/emory_protests.
[9] *Id* at 24:41.

28.  Although Ms. Mohammad never explicitly named the faculty member, Dr. Joshua Winer's identity became public prior to the *Democracy Now!* interview, after he published an op-ed in *The Times of Israel* on March 7, 2024. In the post, Dr. Winer detailed his travel to Israel and his volunteer work with the IDF in both military and civilian roles, while also identifying himself as a general surgeon affiliated with Emory and its hospitals.[10] Ms. Mohammad learned of Dr. Winer's actions through this self-published account.

C.  **Complaints Filed Against Ms. Mohammad and the Disciplinary Process**

29.  On June 18, 2024, fifty-three (53) days after her interview with *Democracy Now!*, Dean Eley notified Ms. Mohammad via email that two complaints had been filed against her for violating the Code of Conduct.[11] This initial email failed to specify individualized charges, although the allegations were confirmed to relate to Ms. Mohammad's appearance on *Democracy Now!*.

30.  According to the Code of Conduct, Ms. Mohammad was required to attend a preliminary meeting to review the complaints.

---

[10] Josh Winer, *An Ongoing Quest to Serve*, THE TIMES OF ISRAEL, (Mar. 7, 2024, 1:47 PM), https://blogs.timesofisrael.com/an-ongoing-quest-to-serve/.
[11] Ex. D (Dean Eley's original notification of an allegation against Ms. Mohammad).

31. On July 8, 2024, Dr. Monica M. Farley, an SOM professor, submitted her investigative report to Dean Eley.[12]

32. Dr. Farley's report indicated that Dr. Winer filed the initial complaint against Ms. Mohammad, claiming her language put him and his family at risk, even though he had already publicly disclosed his IDF volunteer service. Dr. Erica Brownfield, the Associate Dean for Medical Education at the time, also filed a complaint.

33. In the report, Dr. Farley acknowledged Ms. Mohammad's speech was likely consistent with academic freedom under the Code of Conduct yet concluded that her specific reference to an SOM faculty member violated professionalism standards. Citing the SOM Expectations Codes[13] and the Code of Conduct,[14] Dr. Farley recommended that Dean Eley proceed with formal charges against Ms. Mohammad.[15]

34. Specifically, Dr. Farley cited the following provisions that she believed Ms. Mohammad may have violated:

---

[12] Ex. E (Investigative report conducted by Dr. Farley).
[13] Ex. B (Emory School of Medicine Professionalism Expectations (last modified on July 9, 2024)).
[14] Ex. A (Emory School of Medicine Code of Conduct, as in effect during the relevant period. (last modified on July 17, 2023)).
[15] Ex. E.

From the Professional Conduct document:

Use of Social Media section, page 1: "In all communications, students are expected to be courteous, respectful, and considerate of others."

AMSA Social Media Guidelines for Medical Students and Physicians, Guidelines for Social Networking, page 2: "Be responsible. Carefully consider content and exercise good judgement as anything you post can have immediate and/or long-term consequences and carry the potential for significant public impact and viral spread of content."

AMSA Social Media Guidelines for Medical Students and Physicians, Guidelines for Social Networking, page 2: "Be respectful. Do not use defamatory, vulgar, libelous and potentially inflammatory language...that is disrespectful for any individual or group.."

From the Code of Conduct document:

1. Basic Expectations/Inherent Authority section, page 1: "..the School of Medicine and the University at large assumes high standards of courtesy, integrity, and responsibility in all of its members; that each student is responsible for their conduct..."

2. Prohibited Conduct Section, page 2, general statement: "Each student may be subject to this Code whether misconduct occurs on University premises, at University or School of Medicine sponsored activities, or at any location off-campus when such conduct is brought to the attention of the University or the School of Medicine."

3. Prohibited Conduct section, page 2, item 2: "Causing physical harm to any person or causing reasonable apprehension of such harm."

4. Prohibited Conduct section, page 3, item 4: "Engaging in conduct directed at a specific person or persons that

seriously alarms or intimidates such person or persons..."
"Such conduct may include: explicit or implicit threats,
...making remarks in a public place to a specific person
that...expose a person to public hatred"

5. Prohibited Conduct section, page 3, item 6: [Possibly]
"Violating the University's Policy on Equal Opportunity and
Discriminatory Harassment."[16]

35.  On July 11, 2024, Dean Eley contacted Ms. Mohammad to schedule a
meeting the following day to discuss the findings of Dr. Farley's investigation,
providing less than 24 hours' notice.[17] Ms. Mohammad and her faculty advisor,
Professor Karida L. Brown, requested the report in advance, as is standard
practice.[18] They received no response.

36.  On July 12, 2024, despite Ms. Mohammad's objections that the report was
flawed, lacked evidentiary support, and omitted any reference to Dr. Winer's op-ed
identifying his IDF service in an English publication widely available on the
internet, Dean Eley approved Dr. Farley's report.

37.  On September 13, 2024, Dean Eley contacted Ms. Mohammad again
regarding the disciplinary process for the alleged violation of the Code of Conduct.
In his letter, he introduced a new set of charges without explanation, citing only the

---

[16] *Id* at 3.

[17] Ex. F (Dean Eley's request for a meeting with Ms. Mohammad post-investigative
report).

[18] *Id* (In an email reply, Professor Brown stated it is "quite unusual to move
through an investigation process with such asymmetry of information."

"Standards of Professionalism" section of the Code of Conduct and omitting the multiple violations previously identified by Dr. Farley.[19]

38.  The new Code of Conduct violations that Dean Eley unilaterally decided upon were as follows:

> Honesty — Being truthful in communication with all others, both in the healthcare arena and in the community.
>
> Professional Communication and Demeanor — Being thoughtful and kind when interacting with patients, their families, other members of the healthcare team, and all others; maintaining civility in all relationships; striving to maintain composure under pressures of fatigue, professional stress or personal problems.
>
> Respect for the rights of others — Dealing with all others, whether in a professional or non- professional setting, in a considerate manner and with a spirit of cooperation.[20]

39.  In this letter, Dean Eley, per the Code of Conduct[21], also presented Ms. Mohammad with two options: (1) accept guilt on the charges and allow Dean Eley to determine the appropriate sanction(s), or (2) proceed to a hearing in front of an *ad hoc* committee to be appointed by Dean Eley, himself.[22] Maintaining that she did not commit any violations, Ms. Mohammad took the only available option and proceeded to a hearing.

---

[19] Ex. G (Charge Letter from Dean Eley, Regarding Consented-to Charges for the Conduct Hearing.).

[20] *Id*, citing Ex. B at 1-2.

[21] Ex. A.

[22] *Id* at 5.

14

40.  On October 15, 2024, Dean Eley emailed Ms. Mohammad to schedule a conduct committee meeting for November 6, 2024, to which Ms. Mohammad replied that her faculty advisor would be unavailable between November 2, 2024, and November 10, 2024.[23] Dr. Eley agreed to reschedule this meeting.[24]

41.  Despite this previous arrangement being made, on October 23, 2024, Dr. William M. McDonald, the appointed Chair of the Conduct Council who leads student disciplinary proceedings, told Ms. Mohammad that her hearing was rescheduled for November 5, 2024, causing her additional stress.[25] When Ms. Mohammad again explained that her advisor was unavailable, she received a non-committal response that they were attempting to accommodate her request.

42.  Dr. McDonald emailed Ms. Mohammad on October 28, 2024, announcing that her hearing was officially set for November 12, 2024, and listed the charges being brought against her.[26] Upon review, however, Ms. Mohammad found that the charges had once again been changed and no longer reflected those presented by Dean Eley, in violation of the Code of Conduct, which states that formal charges

---

[23] Ex. H (Initial email from Dean Eley regarding the scheduling of the conduct hearing).

[24] Ex. I (Confirmation from Dean Eley that the conduct hearing will be rescheduled).

[25] Ex. J (Email from Dr. McDonald scheduling the hearing despite Ms. Mohammad's prior expression of unavailability.).

[26] Ex. K at 2 (Charge letter from Dr. McDonald with incorrect charges).

are to be presented by the Executive Associate Dean for Medical Education and Student Affairs—not the Chair of the Conduct Council.[27]

43.  The Code of Conduct states that "the Executive Associate Dean for Medical Education and Student Affairs will then meet again with the student and present the student with a letter stating the formal charges and a copy of all documents relevant to the case."[28] Here, however, the Chair of the Conduct Committee sought to alter the charges after consent.

44.  While Ms. Mohammad had agreed to the charges stated by Dean Eley on September 13, 2024, she had not agreed to the new charges, which were as follows:

> Violating the School of Medicine Standards of Professionalism. As set forth in the Student Handbook. "It is neither possible nor necessary to specify every instance of misconduct that could result in disciplinary action against a student."
>
> Violations of the Standards of Professional Conduct as described in the Student Handbook may also constitute 'Prohibited Conduct' that is subject to this Code of Conduct." (emphasis added). Similarly, paragraph 24 of the Prohibited Conduct section states that "Violating any. . . University or School of Medicine rules, regulations, or policies including but not limited to the 'Standards of Professionalism'. . . is conduct that may subject a student to disciplinary action." The School of Medicine Professionalism standards include, for example, an expectation of (a) Honesty – "being truthful in communication with all others, both in the healthcare arena and in the community;" and (b) Professional Communication and Demeanor – "being thoughtful and kind" and "maintaining civility in all relationships."

---

[27] Ex. A at 5.

[28] *Id.*

Causing physical harm to any person or causing reasonable apprehension of such harm. (Prohibited Conduct, paragraph 2)

"Engaging in conduct directed at a specific person or persons that seriously alarms or intimidates such person or persons and that serves no legitimate purpose. Such conduct may include: explicit or implicit threats. . . making remarks in a public place to a specific person that. ... expose[s] a person to public hatred. . ." (Prohibited Conduct, paragraph 4).[29]

45. After Ms. Mohammad questioned Dr. McDonald as to the new charges,[30] he agreed to use Dean Eley's original charge letter instead.[31]

46. Dr. McDonald originally set the deadline for submitting evidence for all parties as Thursday, November 7, 2025. Although Ms. Mohammad abided by this deadline, Dr. McDonald proceeded to amend the submission deadline, allowing Dr. Winer to submit evidence that would otherwise have been excluded.[32]

47. The investigation also excluded material evidence from Ms. Mohammad's defense without valid justification, including documented Open Expression Policy violations and sworn testimony from her faculty advisor regarding the "fidelity of

---

[29] *Id.*

[30] Ex. L (Email from Ms. Mohammad asking why there are new charges that she did not consent to).

[31] Ex. M (Email from Dr. McDonald agreeing to use the charge letter from Dean Eley).

[32] Ex. R (Email from Ms. Mohammad to Dr. McDonald expressing concern about the late addition of evidence).

the conduct process."[33] This denied her the opportunity to present critical evidence central to her defense.

48.  Even with the amended submission deadline of Saturday, November 9, 2024, Dr. McDonald allowed Dr. Winer to add a new testifying witness on Sunday evening, November 10, 2024.[34] Dr. Winer was then allowed to add even more evidence on Monday, November 11, 2024, the day before the hearing, with Dr. McDonald once again extending the deadline solely to accommodate Dr. Winer.[35]

49.  Beyond the inherent unfairness of shifting deadlines to accommodate one party while the other consistently met every requirement and deadline, this practice placed Ms. Mohammad's defense team at a distinct disadvantage. Although both parties were told that all evidence would be made available on Friday, November 8, 2024,[36] Ms. Mohammad did not receive access until the following morning, on Saturday, November 9, 2024.[37]

---

[33] Ex. N (Email from Dr. McDonald rejecting certain pieces of Ms. Mohammad's evidence).

[34] Ex. Q (Mr. McDonald's approval of a new witness for Dr. Winer after the initial evidence submission deadline).

[35] Ex. R.

[36] Ex. O (Initial email that Dr. McDonald sent to Ms. Mohammad, claiming that the evidence folder was shared with her).

[37] Ex. P (Email showing that evidence was properly shared with Ms. Mohammad).

50.  This sequence of events not only gave Dr. Winer and his team ample time to review Ms. Mohammad's evidence but also left her team with only one day to review the full scope of Dr. Winer's submissions.[38]

51.  In response, Dr. McDonald stated that Ms. Mohammad could submit additional evidence and explained Dr. Winer's delay was due to work obligations, failing to address the underlying procedural unfairness and the fact that Ms. Mohammad had already submitted everything.[39]

52.  Following the hearing on November 12, 2024, the Committee concluded that Ms. Mohammad violated "the standards and expectations of the medical profession" based on their belief that her statement accusing Dr. Winer of "aiding and abetting a genocide" through his IDF service was untruthful. This conclusion was reached despite the Committee's finding that she did not violate the Honesty expectation.[40]

53.  The Hearing Committee also found that Ms. Mohammad violated the expectation of Professional Communication and Demeanor and the expectation of Respect for the Rights of Others.[41]

---

[38] Ex. R.

[39] Ex. S (Dr. McDonald's response to Ms. Mohammad's evidence concerns).

[40] Ex. T at 4 (Hearing Decision of the Ad Hoc Conduct Committee).

[41] *Id*.

19

54. These violations were based on two flawed determinations. The Committee concluded that Ms. Mohammad outed Dr. Winer by making him identifiable through his actions, despite never naming him. The Committee also deemed Ms. Mohammad "untruthful" about Dr. Winer's role in genocide, despite his admitted IDF service during operations that constitute acts of genocide under international law.[42]

55. Importantly, there was also no tangible evidence that Dr. Winer suffered harm because of the interview; Dr. Winer only claimed that the video was "disrespectful, and harmful to him and his family and potentially damaging to his career" and that he "felt threatened."[43]

56. Per the hearing decision, Ms. Mohammad was issued a one-year suspension from the SOM, effective the date of the conclusion of her PhD program at Emory's Laney Graduate School.[44] Following her return to Emory after suspension, Ms. Mohammad will remain on probation until the date of her graduation.

---

[42] *Id.*
[43] *Id* at 2.
[44] *Id*.

57. Per SOM policy, Ms. Mohammad appealed her suspension decision to Dr. Sandra L. Wong ("Dean Wong"), Dean of the SOM.[45] Ms. Mohammad challenged this decision on four grounds.

58. First, Ms. Mohammad asserted that based on the investigation, she was only found guilty of violating three expectations from the Emory expectations site—Honesty, Professional Communication and Demeanor, and Respect for the rights of others—not any actual provisions of the Code of Conduct.[46]

59. Furthermore, no explanation was provided for why Dean Eley unilaterally changed the charges initially recommended by Dr. Farley, aside from his assertion that the new charges better reflected the situation. Ms. Mohammad also noted that Dean Eley had spent more than two months pressuring her to admit guilt to the recommended initial charges, despite apparently not believing those charges were accurate.[47]

60. Second, Ms. Mohammad raised multiple concerns about the disciplinary process itself. She identified several procedural irregularities, including inadequate communication between Dean Eley and Dr. McDonald, as evidenced by Dr. McDonald's attempt to introduce new charges that demonstrated his bias against Ms. Mohammad and in support of Dr. Winer.

---

[45] Ex. U (Ms. Mohammad's appeal of the committee's decision).
[46] *Id* at 2.
[47] *Id*.

61.  Ms. Mohammad also alerted Dean Wong that Dr. McDonald had unilaterally changed evidence deadlines, seemingly based on *ex parte* communications with Dr. Winer. She further noted that Dr. Winer received her full evidence packet four days before the hearing. In contrast, she did not receive his final materials until the day prior, highlighting the fundamental inequity of the process.

62.  Dr. McDonald also excluded several pieces of evidence that Ms. Mohammad sought to submit, including materials supporting the truthfulness of her statement regarding Dr. Winer's role in aiding and abetting a genocide, as well as concerns raised by the Committee for Open Expression about the investigation.[48]

63.  The final and most direct indication of bias in the process came when Dean Eley told Ms. Mohammad, before the hearing, that the outcome would be worse for her if she chose to proceed rather than admit guilt. This warning reflected a coercive and hostile environment, further underscored by the hearing committee's decision, which relied exclusively on facts presented by Dr. Winer and disregarded the evidence submitted by Ms. Mohammad.[49]

---

[48] *Id* at 3.
[49] *Id* at 3-4.

64. Next, Ms. Mohammad challenged the SOM's interpretation of the Code of Conduct, noting that she faced no specific conduct violations but was instead subjected to a Conduct Hearing based on subjective and vaguely defined professionalism standards.

65. Finally, given the fact that Ms. Mohammad did not violate any portion of the Code of Conduct, that the entire process appears to have been rigged against her, and that the Office of Open Expression explicitly expressed concern about the process and recommended that all charges be dropped, she stated that the sanctions were inappropriate.[50]

66. On December 30, 2024, Dean Wong denied Ms. Mohammad's appeal in full.[51] She stated that, because the Code of Conduct incorporates the Expectations of Professionalism, a violation of those expectations also constitutes a violation of the Code of Conduct. As for the revised charges, Dean Wong explained that Dean Eley modified them in response to Ms. Mohammad's objections.[52]

67. Dean Wong responded to Ms. Mohammad's concerns about bias by noting that Dr. McDonald's proposed charges were not included in the final proceedings and that Ms. Mohammad had been granted additional time to submit evidence.[53]

---

[50] *Id* at 4-5.
[51] Ex. V (Dean Wong's rejection of Ms. Mohammad's appeal).
[52] *Id* at 1-2.
[53] *Id* at 2-3.

23

However, she failed to address the core issues—the impropriety of introducing new charges mid-process and the unequal access to evidence, which gave Dr. Winer more time to review Ms. Mohammad's materials than she had to review his submissions.

68.  Dean Wong rejected the idea that there was any issue with the exclusion of the Office for Open Expression's findings.[54]

69.  Once again noting that professionalism is incorporated into the Code of Conduct, Dean Wong found that the interpretation of the Code of Conduct was proper.

70.  Ultimately, based on the above findings, Dean Wong concluded that the sanctions were appropriate.

### D. **Ms. Mohammad's Discrimination Complaint**

71.  In July 2024, Ms. Mohammad filed three complaints with Emory's Office of Institutional Equity and Compliance.

72.  In those complaints, Ms. Mohammad alleged that Dean Eley and the SOM's Mistreatment Process engaged in discriminatory behavior against students of color. Specifically, she alleged that the Mistreatment Form had been weaponized to support false claims of antisemitism against students of color who shared human rights reports about Israel's violence in Gaza. At the same time, the

---

[54] *Id* at 3.

same process ignored serious incidents of doxxing and harassment against students of color,[55] including Ms. Mohammad herself.[56]

73. Ms. Mohammad also raised direct concerns about Dean Eley's behavior, including emailing her about the allegations on Eid al-Adha, an important Muslim religious holiday, despite recent training on respecting Muslim holidays.[57] She reported that professionalism complaints disproportionately target women of color and that Emory fails to address faculty racism. Ms. Mohammad also noted Dean Eley's quick condemnation of antisemitism, but his silence on rising anti-Muslim and anti-Palestinian bias.

74. Ms. Mohammad also raised concerns about a conflict of interest: Dean Eley would either impose sanctions directly or handpick the committee that would decide her guilt. She also objected to the broader process, including inequities in evidence submission, which barred students from presenting evidence until a full investigation was already underway.[58]

75. Upon information and belief, all three complaints are still pending at the time of this Complaint.

---

[55] Ex. Z (Ms. Mohammad's internal Complaint about the Mistreatment Form/Process.).
[56] Ex. W (Evidence of Ms. Mohammad being doxxed).
[57] Ex. X (Ms. Mohammad's Internal Complaint about Dean Eley).
[58] Ex. Y (Ms. Mohammad's Internal Complaint about the Conduct Hearing Process).

E. **Findings of the Committee for Open Expression**

76. As the investigation continued, Ms. Mohammad contacted Emory's Committee for Open Expression, requesting intervention due to potential violations of the Respect for Open Expression Policy.[59]

77. On July 15, 2024, Ms. Mohammad contacted Dr. Ilya Nemenman, Chair of Emory's Senate Committee for Open Expression ("CFOE"), requesting an independent review of the situation, to which Dr. Nemenman agreed.[60]

78. On August 2, 2024, Dean Eley responded to Dr. Nemenman, claiming that the CFOE has no role in an SOM student disciplinary matter.[61] In response, Dr. Nemenman cited the Open Expression Policy 8.14.2, which states that "[t]his Policy is paramount to other Emory policies that may conflict, except those grounded expressly in local, state, or national law," and requested that the CFOE have input in the investigation of Ms. Mohammad.[62]

79. On August 7, 2024, Emory Law Professor and President of the University Senate George B. Shepherd again urged Dean Eley to reverse his refusal to

---

[59] Though not bound by First Amendment requirements as a private institution, Emory's Open Expression Policy establishes institutional free speech protections for the campus community.

[60] Ex. Z2 at 6 (Findings report of the Committee for Open Expression).

[61] Ex. Z1 (Email thread between Dr. Nemenman & Prof. Shepherd and Dean Eley regarding Open Expression).

[62] Ex. C at 3. Last revised September 21, 2018. Although Emory's March 20, 2025 revision removed this language, the 2018 version was the operative policy during the events in question.

cooperate with Dr. Nemenman, stressing that the Open Expression Policy is "paramount" and warning that "[a] student's right to free expression is implicated most dramatically when Emory disciplines a student for what they have expressed."[63]

80.  After two weeks of silence, Dr. Shepherd followed up with Dean Eley on August 23, 2024, setting a response deadline of August 30—but received no reply.

81.  Despite not being allowed to participate in the SOM's disciplinary process, the CFOE published its report regarding the violation of Ms. Mohammad's Open Expression on September 23, 2024.[64]

82.  In a unanimous decision, the CFOE determined that the Open Expression Policy protected Ms. Mohammad's speech. In support of this decision, the CFOE noted the following:

> (1 ) her speech was outside of Emory, (2) it was on an issue of public importance, (3) it was not manifestly a falsehood (there is an honest debate in the public sphere whether action of Israel in Gaza amount to genocide), (4) it was an opinion, and (5) the University has not shown disruption or other harm due to her speech. Further, (6) there might be extra protection to speech in [the] context of a university based on the concept of academic freedom. An additional consideration is that this case involved description of actions of a specific University faculty member, so that the previous opinion by CFOE on Displays naming specific people (2019) is also relevant. However, we note that the faculty in question was not named in Ms. Mohammad's speech, and

---

[63] Ex. Z1.
[64] Ex. Z2.

his identity was revealed by his own actions (e.g., his own [] article in a newspaper).[65]

83.  The CFOE also reprimanded the incorrect assertion of Dean Eley and Emory's General Counsel that the Open Expression Policy did not apply to Ms. Mohammad's disciplinary matter, stating that the SOM was not only violating the Open Expression Policy, but also their own "principles of professionalism and mutual respect."[66] Finally, the CFOE requested that the SOM drop all Code of Conduct proceedings against Ms. Mohammad.[67]

84.  Ms. Mohammad was not allowed to present this as evidence during her disciplinary hearing.[68]

### F.  Ongoing Harm

85.  On Friday, July 18, 2025, Ms. Mohammad was notified by Dr. Jaffar Khan, a professor and the Division Director for General Neurology and Neuro-otology in the SOM, that a new Code of Conduct complaint had been brought against her.[69]

86.  On July 21, 2025, Dr. Khan confirmed that this new complaint involves an allegation that Ms. Mohammad has "continued to repeat and amplify statements

---

[65] *Id* at 4.

[66] *Id.*

[67] *Id* at 5.

[68] Ex. N.

[69] Ex. Z3 (Email thread regarding new conduct allegations against Ms. Mohammad).

about Dr. Joshua Winer that are similar to those made in the *Democracy Now!* interview."[70]

87.  Ms. Mohammad now risks more severe discipline, potentially including expulsion from SOM, due to the initial complaint and discipline process challenged here.

88.  Furthermore, given that Emory has updated their Respect for Open Expression policy and removed any statement regarding its supremacy to other policies,[71] Ms. Mohammad is at greater risk of her speech being found in violation of the Code of Conduct once again.

## IV.    CLAIMS FOR RELIEF

### COUNT I
### Intentional Discrimination Based on National Origin
### In Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
### (Against Defendant Emory University)

89. Emory receives hundreds of millions of dollars in federal government grants and contracts annually.[72] As a result, the institution is subject to Title VI, which prohibits discrimination based on race, color, and national origin in programs that

---

[70] *Id.*

[71] Emory Univ. *supra* note 6.

[72] Emory University Reported Data, NAT'L CTR. FOR EDUC. STAT., https://nces.ed.gov/ipeds/reported-data/139658?year=2023&surveyNumber=6 (last visited July 18, 2025) (noting that between September 1, 2022, and August 31, 2023, Emory received $705,703,000 in federal grants and contracts, excluding Federal Direct Student Loans).

receive federal funding in order to promote equitable access to educational opportunities and programs.[73]

90.  Plaintiff is a member of a protected class under Title VI based on her Arab and Palestinian heritage.[74] ¶ 7.

91. Emory's conduct violates 34 C.F.R. § 100.3(b)(1)(i), which prohibits recipients from utilizing criteria or methods of administration that subject individuals to discrimination, and § 100.3(b)(2), which mandates equal treatment regardless of national origin.[75]

92.  Title VI prohibits both disparate treatment and exclusion from educational programs based on national origin, creating an actionable claim when a federally funded institution intentionally discriminates against students based on their protected characteristics.[76]

---

[73] 42 U.S.C. § 2000d (2018) ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); *see also* Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, §§ 3(a), 6, 102 Stat. 28, 29 (1988) (clarifying that Title VI and Title IX apply institution-wide when any part of the institution receives federal funds), superseding *Grove City Coll. v. Bell*, 465 U.S. 555 (1984).

[74] *See Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 613 (1987) (determining 42 U.S.C. § 1981 applies to discrimination based on Arab ancestry).

[75] *See* 34 C.F.R. §§ 100.3(b)(1)(i), 100.3(b)(2).

[76] *See, e.g., Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 286-87 (1998) (describing Title VI and Title IX as "parallel" Spending Clause statutes subject to consistent interpretation regarding the scope of implied private rights of action).

93.  Plaintiff's interview on *Democracy Now!* about her Palestinian identity, family displacement, and experiences is a form of expression closely linked to her national origin, protected from discrimination by federal courts.[77] Disciplining students for expressing their cultural identity solely based on assumptions about its political significance amounts to discrimination, which Title VI prohibits.[78]

94. Emory intentionally discriminated based on national origin by applying disciplinary policies selectively to Plaintiff because of her Palestinian identity and views. She was suspended for discussing Palestinian experiences and criticizing Israeli military actions publicly. In contrast, Dr. Winer, a Jewish faculty member who praised his own service in the Israeli Defense Forces in an international publication, was not disciplined, despite speaking as an Emory affiliate.[79] ¶¶ 26-28.

95.  The roughly seven-week gap between Plaintiff's April 26, 2024, *Democracy Now!* interview and Emory's June 18, 2024, disciplinary case suggests

---

[77] *See Alexander v. Choate*, 469 U.S. 287, 293 n.5 (1985) (holding that Title VI prohibits intentional discrimination); *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977) (outlining factors to prove discriminatory intent through circumstantial evidence, including procedural irregularities and departures from everyday decision-making).

[78] *See Dear Colleague Letter*, U.S. Dep't of Educ., Off. for C.R., at 1 (May 25, 2023), https://www.ed.gov/sites/default/files/about/offices/list/ocr/docs/antisemitism-dcl.pdf.

[79] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) (inconsistent enforcement of disciplinary rules may demonstrate discriminatory intent, or pretext).

discrimination, mainly as no new misconduct occurred and the university had permitted prior similar expressions from affiliates.[80] ¶ 29.

96. The Committee for Open Expression's finding that Plaintiff's speech was protected was a binding decision under Emory's own policies. Emory's rejection shows discriminatory bias instead of fair policy enforcement, abandoning procedures that would have protected a Palestinian student's expression.

97. Emory's conduct demonstrates a pattern of intentional discrimination: (a) ignoring its Committee for Open Expression's findings that Plaintiff's speech was protected expression; (b) engaging in procedural irregularities; and (c) treating similarly situated individuals differently based on national origin and viewpoints.[81] ¶¶ 37, 41, 42-44, 46-49, 54-55, 78-84.

98. Emory's proffered justification for disciplining Plaintiff lacks credibility and constitutes a pretext for discrimination. The university's reliance on professionalism is undermined by tolerating Dr. Winer's similar expression,

---

[80] *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999) (temporal proximity between protected activity and adverse action can establish causation).

[81] *See McDonnell Douglas Corp.*, 411 U.S. at 804; *see also Williams v. Bd. of Regents*, 477 F.3d 1282, 1294 (11th Cir. 2007) (applying the *McDonnell Douglas* burden-shifting framework to analyze intentional discrimination claims under Title VI).

rejecting the Committee's findings, and deviating from disciplinary procedures.[82] [83]

¶ 37.

99.   Emory's selective enforcement targeting Plaintiff's Palestinian viewpoint, close temporal proximity, and procedural deviations collectively establish a "convincing mosaic" of intentional discrimination under Title VI.[84]

100. Plaintiff's discriminatory suspension directly hindered her access to education and opportunities, including: (a) interruptions to her academic progress and coursework; (b) being barred from campus educational resources and activities; (c) disruption of her involvement in university programs; and (d)

---

[82] *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (explaining that a plaintiff's evidence of pretext, combined with a prima facie case, can be sufficient for a jury to conclude that the employer intentionally discriminated).

[83] Jubilee, Do All Trump Voters Think the Same? | Spectrum: Election 2020 (Part 1), YOUTUBE, at 3:34, 11:24 (Oct. 24, 2020), https://www.youtube.com/watch?v=vPh21aXEFNo (medical student affiliated with Emory made controversial statements about sexual assault and COVID-19; Emory later determined speech was protected expression and did not violate professionalism standards).

[84] *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (holding that intentional discrimination may be proven through "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker"), superseded in part by statute on other grounds; *see also Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946–47 (11th Cir. 2023), cert. denied, 145 S. Ct. 154 (2024) (reaffirming that circumstantial evidence can prove intentional discrimination without satisfying the *McDonnell Douglas* framework).

fostering a hostile educational environment rooted in her national origin.[85] ¶ 56. These barriers constitute the denial of educational benefits and equal access to educational opportunities prohibited by Title VI.

101. As a direct and proximate result of Defendants' intentional discrimination, Plaintiff has incurred compensable damages including: (a) disruption to her academic progress; (b) reputational harm within the Emory community; (c) emotional distress; (d) interference with her educational opportunities; and (e) denial of equal access to Emory's educational programs and benefits.[86] Title VI provides a private cause of action for such intentional discrimination and resulting injuries.[87]

102. Alternatively, Emory's facially neutral policies on "professional" expression have a disparate impact on students of Palestinian, Arab, and Middle Eastern descent, violating Title VI. The university's subjective and inconsistent standards disproportionately burden these students, whose national origin and

---

[85] *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650–51 (1999) (holding that a hostile educational environment that denies a student equal access to educational opportunities can be a form of actionable discrimination).
[86] *See Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012) (affirming a compensatory damages award under Title VI for a racially hostile educational environment).
[87] *See Alexander,* 532 U.S. at 280–81 (holding that Title VI's private right of action is limited to claims of intentional discrimination); *cf. Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 346 (11th Cir. 2012) (recognizing that compensatory damages are available for intentional discrimination under the Rehabilitation Act and ADA).

cultural identities are tied to ongoing geopolitical conflicts. As a result, these policies restrict their equal access to educational opportunities and hinder full participation in university life based on their protected characteristics.

**COUNT II**
**Retaliation for Engaging in Protected Activity**
**In Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**
**(Against Defendant Emory University)**

103. As alleged above, Defendant receives federal financial assistance and is subject to Title VI.[88] ¶ 89.

104.  Plaintiff engaged in protected activity under Title VI by publicly opposing discriminatory treatment she personally experienced as a Palestinian-American student at Emory and by filing formal bias complaints regarding her treatment at the institution.[89] Plaintiff reasonably believed that Emory's differential treatment of her Palestinian identity and viewpoints, versus its tolerance of others' geopolitical expressions, amounted to unlawful discrimination based on national origin. ¶¶ 25, 72-74.

105. Plaintiff's *Democracy Now!* interview on April 26, 2024, constituted protected opposition conduct under Title VI, as she publicly criticized Emory's

---

[88] *See* 42 U.S.C. § 2000d.
[89] *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) (holding that retaliation for complaints about discrimination constitutes intentional discrimination under Title IX, which is interpreted consistently with Title VI); *see also* 28 C.F.R. § 42.104(e) (2024) (prohibiting recipients of federal financial assistance from retaliating against individuals who have made a complaint or participated in an investigation).

alleged discriminatory treatment of students based on their national origin and called attention to systemic bias within the institution.[90] ¶¶ 28, 70. Her statements were objectively reasonable given the documented pattern of differential treatment of Palestinian students at Emory. ¶ 15-17, 24.

106. Plaintiff engaged in protected activity by filing formal bias complaints with Emory's administration, documenting discrimination against her and requesting remediation. ¶ 71-73.[91]

107.  Emory was aware of Plaintiff's protected activities, as university administrators were directly notified of her public statements through media coverage and received her formal bias complaints through official university channels.[92] The DOE Resolution Agreement demonstrates that Emory was aware

---

[90] *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (establishing the standard for an adverse action in a retaliation claim as an action that is "materially adverse" to a reasonable employee); *see also Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 276 (2009) (holding that an employee's passive reporting of discrimination during an internal investigation constitutes protected "opposition" activity).

[91] *See* U.S. DEP'T OF JUSTICE, CIV. RTS. DIV., TITLE VI LEGAL MANUAL § VIII (2021), https://www.justice.gov/crt/fcs/T6Manual8 (prohibiting retaliation against individuals who file complaints or participate in Title VI proceedings).

[92] *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1274 (11th Cir. 2008) (requiring a plaintiff to show that the defendant's decision-maker was aware of the protected activity to establish a causal connection for a retaliation claim).

of systemic issues in how Palestinian and Arab students were treated, making its later retaliation against Plaintiff for raising similar concerns especially egregious.[93]

108. Emory retaliated against Plaintiff by starting disciplinary proceedings on June 18, 2024—about seven weeks after her *Democracy Now!* interview—suspending her from medical school, ignoring the Committee for Open Expression's protective findings, and subjecting her to irregular, heightened scrutiny not used for other students. This retaliation caused her suspension, reputational damage, academic setbacks, and lost career opportunities, making her eligible for compensatory damages.[94] ¶¶ 29, 78-84.

109. The temporal proximity between Plaintiff's protected activities and Emory's adverse actions creates a prima facie case of retaliatory causation, particularly given that Emory had not previously disciplined students for similar conduct, no new misconduct occurred, and the university had tolerated comparable expressions by other students before her complaints.[95] The timing is especially

---

[93] *See* U.S. Dep't of Educ., Off. for C.R., *Resolution Agreement*, OCR Ref. No. 04-24-2178, (Jan. 17, 2025); ¶ 20.

[94] *See Burlington Northern*, 548 U.S. at 67-68; *see also Lowery v. Euverard*, 497 F.3d 584, 594 (6th Cir. 2007) (holding that academic retaliation against students who oppose discrimination is actionable under federal civil rights laws).

[95] *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (three-month gap between protected activity and adverse action sufficient for causation); *Brungart v. BellSouth Telecomms.*, Inc., 231 F.3d 791, 799 (11th Cir. 2000) (close temporal proximity alone may establish causation when adverse action follows protected activity).

probative given that Plaintiff's suspension occurred within the statute of limitations period, demonstrating a continuing pattern of retaliation. ¶¶ 29, 71.

110. Following Plaintiff's protected activities, Emory deviated from its usual disciplinary procedures by: (a) ignoring binding conclusions from its Committee for Open Expression; (b) using inconsistent standards compared to students in similar situations; (c) issuing sanctions based on vague and pretextual "professionalism" allegations that were not applied to other students; and (d) employing irregular timelines and procedural shortcuts not outlined in standard university protocols.[96] ¶¶ 52-53, 78-80, 84.

111. Emory's stated reasons for disciplining Plaintiff are unconvincing and appear to be a pretext for retaliation because: (a) the university's own Committee determined her speech was protected by institutional policy; (b) there was no valid disciplinary reason under university standards; (c) individuals in similar situations engaging in comparable expression were not disciplined; and (d) procedural irregularities indicate discriminatory intent rather than genuine policy enforcement.[97]

---

[96] *See Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009) (deviation from established procedures constitutes circumstantial evidence of discriminatory intent); *see also Reeves*, 530 U.S. at 147 (inconsistent explanations and procedural deviations may indicate pretext).

[97] *See McDonnell Douglas,* 411 U.S. at 804; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (explaining that the rejection of an employer's proffered reasons allows for an inference of discriminatory intent).

112. This retaliation occurred in addition to and as a consequence of the intentional discrimination alleged in Count I, creating an ongoing pattern of escalating adverse treatment based on Plaintiff's national origin and her efforts to oppose such discrimination.[98]

113. As a direct and immediate result of Emory's unlawful and ongoing retaliation, Plaintiff has suffered and continues to suffer: (a) suspension from medical school along with related academic and professional setbacks; (b) significant damage to her reputation within the academic and medical communities; (c) delays in her academic progress that affect her medical career trajectory and future residency chances; (d) loss of educational and professional opportunities, including clinical rotations and research roles; (e) ongoing emotional distress and anxiety caused by retaliatory actions; (f) disruption to her ability to express her cultural identity and oppose discrimination freely; and (g) financial damages, such as tuition costs for failure to complete her program, all of which are recoverable under Title VI.[99]

---

[98] *See Thompson v. North Am. Stainless, LP, 562 U.S. 170, 174 (2011)* (retaliation provisions serve the broader purpose of maintaining unfettered access to statutory remedial mechanisms); *Burlington Northern,* 548 U.S. at 68 (anti-retaliation provisions protect against actions that might deter a reasonable person from opposing discrimination).

[99] *See Alexander*, 532 U.S. at 280-81 (private right of action exists for intentional discrimination under Title VI); *Zeno*, 702 F.3d at 671 (compensatory damages available for Title VI violations); *cf. Carey v. Piphus*, 435 U.S. 247, 254-55 (1978) (ongoing constitutional violations support continuing damages).

## COUNT III
## Breach of Contract
## In Violation of Georgia Law
## (Against Defendant Emory University)

114. Under Georgia law, a plaintiff asserting a breach of contract claim must establish: "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken."[100]

115. Plaintiff has standing to assert this breach of contract claim as the intended beneficiary of Emory's disciplinary policies and procedures, which were specifically designed to protect student rights and ensure fair treatment in disciplinary proceedings.

116. Plaintiff and Emory formed a binding contractual relationship upon her enrollment, as evidenced by: (a) her acceptance of admission and enrollment in the combined MD/PhD program; (b) payment of tuition and fees; (c) Emory's provision of educational services; and (d) mutual agreement to be bound by university policies and procedures. Under Georgia law, university policies and handbooks constitute enforceable contractual terms.[101]

---

[100]  *Kuritzky v. Emory Univ.* 294 Ga. App. 370, 371, 669 S.E.2d 179, 181 (2008)
[101] *See Morehouse Coll. v. McGaha*, 277 Ga. App. 529, 531-32, 627 S.E.2d 39, 41-42 (2005) (holding that a college's disciplinary handbook, by its nature, constitutes a valid and enforceable contract with students).

117. Georgia courts recognize that a private university's failure to adhere to its own established disciplinary procedures can constitute a breach of contract, particularly when deviations are material rather than minor.[102]

118. Emory materially breached its contractual obligations by failing to follow its own Open Expression Policy, which expressly required mandatory review by the Committee for Open Expression for all cases involving expressive conduct and was designated as "paramount to other policies" during the relevant period. This policy created a binding contractual obligation that Emory was required to honor.[103] ¶¶ 78-79.

119.  Specifically, Emory breached the contract by: (a) refusing to refer Plaintiff's case to the Committee for Open Expression despite the policy requirement; (b) proceeding with disciplinary action even after the Committee unanimously determined that Plaintiff's speech was protected expression; and (c)

---

[102] *See Kuritzky*, 294 Ga. App. at 371, 669 S.E.2d at 181 (reversing dismissal of breach of contract claim against Emory University where plaintiff argued material deviation from disciplinary procedures in bad faith, rejecting university's argument that policies were merely aspirational); *see also Young v. Grand Canyon Univ.*, 980 F.3d 814, 821-22 (11th Cir. 2020) (holding student stated plausible breach of contract claim where university allegedly failed to follow disciplinary procedures).

[103] *See* Found. for Individual Rights in Educ. (FIRE), *FIRE's Guide to Due Process and Campus Justice* 9 (2d ed. 2015), https://www.thefire.org/sites/default/files/2015/07/FIRE-2015-Guide-to-Due-Process-and-Campus-Justice.pdf (stating that private universities are often contractually bound to follow their own established disciplinary processes).

disregarding the Committee's formal request to intervene in the proceedings.[104] ¶¶ 78-84.

120. Emory further breached its contractual obligations by manipulating procedural deadlines and notice requirements, including: (a) providing Plaintiff with less than 24 hours' notice for critical meetings; (b) attempting to alter charges mid-process without adequate notice; and (c) enforcing deadlines strictly against Plaintiff while accepting late submissions from faculty complainants.[105] ¶¶ 35, 42-44, 46-51.

121. These contractual violations were not just technical deviations but systematic breaches of established procedures that deprived Plaintiff of fundamental protections promised by the university's policies and represented material breaches of the student-university contract.[106]

122. As a result of Emory's material breaches, Plaintiff has incurred and will continue to incur measurable damages, including: (a) suspension from medical school starting upon her PhD completion in 2027; (b) a one-year delay in graduation and obtaining her medical license, resulting in approximately $300,000 in lost income; (c) her $38,400 annual stipend for living expenses being

---

[104] *Kuritzky,* 294 Ga. App. at 371, 669 S.E.2d at 181 (material deviations from procedures constitute breach).
[105] *Id.*
[106] *See Morehouse*, 277 Ga. App. at 531-32, 627 S.E.2d at 41-42 (systematic procedural violations constitute material breach).

withdrawn; (d) additional costs for education and living during the delay; (e) harm to her reputation that may hinder her residency opportunities; and (f) lowered lifetime earning potential due to postponed entry into her medical career.[107]

### COUNT III-A
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### In Violation of Georgia Law
### (Against Defendant Emory University)

123. Under Georgia law, every contract includes an implied covenant of good faith and fair dealing in its performance and enforcement, which prohibits either party from acting in bad faith or exercising contractual discretion in a manner that frustrates the other party's contractual rights and benefits.[108]

124. The contractual relationship between Plaintiff and Emory encompasses university policies, including the Respect for Open Expression Policy and the Student Code of Conduct, which govern disciplinary procedures and expressive rights and require Emory to enforce them fairly, consistently, and in good faith.[109]

---

[107] *See Young*, 980 F.3d at 821-22 (educational and financial harms recoverable for procedural violations); *see also* O.C.G.A. § 13-6-1 (consequential damages recoverable when they naturally flow from breach and were reasonably foreseeable).

[108] *Brack v. Brownlee*, 246 Ga. 818, 820, 273 S.E.2d 390, 392 (1980) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement"); *see also* O.C.G.A. § 11-1-203; O.C.G.A. § 13-4-20.

[109] *Smithloff v. Benson*, 173 Ga. App. 870, 872-73, 328 S.E.2d 759, 760-61 (1985) (duty applies to both performance and enforcement).

43

125.  Emory breached the implied covenant of good faith and fair dealing by arbitrarily and retaliatorily exercising its disciplinary authority to deprive Plaintiff of procedural protections and substantive rights guaranteed under university policy. Emory's conduct demonstrated subjective bad faith and an intent to frustrate the fundamental purposes of the contractual relationship.[110]

126. Emory's bad faith conduct included: (a) refusing to refer the matter to the Committee for Open Expression despite clear policy and the Committee's express request; (b) continuing disciplinary proceedings after the Committee unanimously found Plaintiff's speech protected; (c) manipulating procedural deadlines to disadvantage Plaintiff while favoring faculty complainants; and (d) using disciplinary authority retaliatorily to punish protected expression instead of for legitimate educational purposes.[111]  ¶¶ 46-51, 78-84.

127. These actions were part of a deliberate pattern to punish Plaintiff for her protected speech and suppress dissent, demonstrating a bad-faith exercise of contractual discretion that frustrated the core purposes of the student-university

---

[110] *See Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 281 Ga. App. 450, 452, 636 S.E.2d 139, 142 (2006) (implied covenant prohibits acting in bad faith to frustrate contract purpose).

[111] *Stuart Enters. Int'l, Inc. v. Peykan, Inc.*, 252 Ga. App. 231, 233-34, 555 S.E.2d 881, 883-84 (2001) (implied covenant prevents de facto breach through bad-faith performance).

agreement and violated Georgia's prohibition against using contractual authority to harm the other party unfairly.[112]

128.  Georgia law prohibits parties from using contractual discretion to undermine the main objectives of the agreement or to act in bad faith toward the other party. Emory's retaliatory application of disciplinary procedures breached this core principle and violated the implied covenant of good faith and fair dealing.[113]

129. Plaintiff is entitled to appropriate relief for this breach, including compensatory damages, consequential damages, and attorney's fees under O.C.G.A. § 13-6-11, as Emory acted in bad faith, was stubbornly litigious, and caused unnecessary trouble and expense through its systematic procedural violations and retaliatory conduct.[114]

**COUNT IV**
**Denial of Procedural Due Process**
**In Violation of Georgia Law**
**(Against Defendant Emory University)**

130. Georgia equity law requires institutions exercising quasi-judicial disciplinary authority to ensure fundamentally fair processes, particularly when

---

[112] *Hunting Aircraft*, 281 Ga. App. at 452, 636 S.E.2d at 142.
[113] *Brack*, 246 Ga. at 820, 273 S.E.2d at 392.
[114] *See* O.C.G.A. § 13-6-11 (authorizing attorney's fees where party acts in bad faith or causes unnecessary trouble and expense).

imposing severe sanctions that affect a student's academic and professional future without meaningful external oversight.[115]

131. Georgia courts recognize that private universities must provide equitable protections when imposing severe disciplinary sanctions, with equitable relief warranted "when the remedy by appeal has failed to eliminate the law violation or gross abuse of discretion."[116]

132. These equitable duties operate alongside enforceable contractual obligations, as student handbooks and disciplinary procedures of private universities constitute binding contracts under Georgia law that must be performed fairly and in good faith.[117]

133. Private universities that materially deviate from their disciplinary procedures in ways that deny fundamental fairness may be liable for breaching both contractual and equitable duties owed to students.[118]

134. Emory violated its contractual and equitable obligations by conducting a fundamentally unfair disciplinary process that denied Plaintiff basic procedural protections, including: (a) providing less than 24 hours' notice for critical meetings;

---

[115] *See* O.C.G.A. § 23-1-8 (2020) (providing that equity will not allow a party to take advantage of its own wrong); *see also* O.C.G.A. § 23-1-2 (2020) (defining equity as justice administered according to the fairness of the deal).
[116] *Barnes v. Clark*, 224 Ga. 226, 227, 160 S.E.2d 357, 359 (1968).
[117] *Morehouse*, 277 Ga. App. at 531-32, 627 S.E.2d at 41-42.
[118] *Id.*

(b) attempting to alter charges mid-process without adequate notice or opportunity to respond; (c) enforcing deadlines selectively and strictly against Plaintiff while accepting late faculty submissions; and (d) refusing to involve the Committee for Open Expression despite mandatory policy requirements.[119] ¶¶ 35, 42-51, 78-81.

135. Emory further denied Plaintiff a fair process by allowing Dean Eley to preside over and influence disciplinary proceedings despite being the direct subject of her formal bias complaints filed early in the process, creating an impermissible structural conflict of interest that violated foundational due process norms and rendered the entire proceeding fundamentally unfair under Georgia law.[120] ¶¶ 73-74.

136. Neutrality is essential in university disciplinary proceedings, and Georgia law guarantees students facing long-term suspension or expulsion the right to a hearing before an "independent, neutral arbiter."[121] Emory undermined

---

[119] *See Kuritzky*, 294 Ga. App. at 371, 669 S.E.2d at 181 (material deviations from established procedures constitute breach of contractual and equitable duties); *Young*, 980 F.3d at 821-22 (procedural violations in disciplinary proceedings state valid claims); *see also* O.C.G.A. § 23-1-7 (equity jurisdiction to remedy procedural unfairness).

[120] *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 883-84 (2009) (due process requires recusal when serious risk of actual bias exists); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) ("A fair trial in a fair tribunal is a basic requirement of due process").

[121] *See* O.C.G.A. § 20-2-751 (2024) (guaranteeing students the right to a hearing before an independent, neutral arbiter for long-term suspension or expulsion); *see also* Ga. Appleseed Ctr. for Law & Justice, *Representing Students in School*

fundamental fairness by permitting Dean Eley, who was both involved in bias complaints and overseeing the disciplinary process, to influence the outcome in violation of basic conflict-of-interest principles.

137. These procedural violations deprived Plaintiff of the fair, impartial forum required by Georgia law and resulted in substantial harm, including delayed graduation, reputational damage, and career disruption that cannot be adequately remedied through monetary compensation alone.[122]

138. Under Georgia equity law, relief is available "where, from any peculiar circumstances, the operation of the general rules of law would be deficient in protecting from anticipated wrong or relieving for injuries done."[123] Emory's systematic disregard for its rules and denial of fundamental procedural fairness necessitate equitable intervention to restore Plaintiff's academic standing and prevent ongoing harm from unlawful discipline.

139. Plaintiff seeks equitable relief, including: (a) reinstatement to good academic standing; (b) expungement of disciplinary records; (c) removal of any notations affecting her medical licensure eligibility; (d) injunctive relief to

_Tribunals in Georgia: Attorney Training Manual_ 6 (4th ed. 2024) ("Tribunal members must serve as impartial decision makers").

[122] _See_ O.C.G.A. § 23-1-4 (2020) (providing that equity will act where a remedy at law is not adequate or complete).

[123] O.C.G.A. § 23-1-7 (2020) (equity jurisdiction where legal remedies are inadequate); _see also Barnes_, 224 Ga. at 227, 160 S.E.2d at 359 (equitable relief available to prevent anticipated wrong or remedy injuries).

prevent further retaliation; and (e) such other equitable relief as the Court deems just and proper.

**COUNT V**
**Intentional Infliction of Emotional Distress**
**In Violation of Georgia Law**
**(Against Defendant John William Eley)**

140. Defendants engaged in extreme and outrageous conduct under Georgia law by systematically violating established procedures, willfully disregarding binding university policies, and retaliating against Plaintiff for engaging in federally and institutionally protected expression.[124]

141. The conduct was sufficiently extreme and outrageous under Georgia law because it involved: (a) systematic abuse of institutional authority over Plaintiff's academic and professional future; (b) deliberate violations of Emory policies protecting student rights; (c) retaliation against protected expression; (d) discrimination and hostility based on nationality; and (e) conduct so contrary to accepted standards of decency as to be utterly intolerable in an educational context.[125]

142. Emory's position of authority over Plaintiff's medical education, career prospects, and professional licensing pathway rendered otherwise questionable

---

[124] *See Mayorga v. Benton*, 364 Ga. App. 665, 670, 870 S.E.2d 517, 520 (2022) (conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community").
[125] *Id.*

conduct sufficiently outrageous to support liability, as Georgia courts recognize that abuse of authority relationships increases the potential for emotional harm.[126]

143. Defendants knowingly or recklessly caused severe emotional distress, demonstrated by: (a) their ongoing discriminatory and retaliatory actions despite being aware of the psychological harm; (b) Plaintiff's protected status as a Palestinian student; (c) the power imbalance between the university and the student; and (d) their deliberate ignoring of procedures meant to prevent such harm.[127]

144. As a direct and proximate result of the Defendants' extreme and outrageous conduct, Plaintiff has suffered and continues to suffer significant emotional distress. This includes clinical anxiety needing therapy, depression impairing her daily life and studies, sleep issues such as insomnia, a loss of enjoyment in academic and professional activities, and ongoing psychological trauma that necessitates ongoing mental health treatment.[128]

---

[126] *See Bridges v. Winn-Dixie Atlanta, Inc.*, 176 Ga. App. 227, 230, 335 S.E.2d 445, 447 (1985) (abuse of position of authority may render otherwise routine conduct sufficiently outrageous for IIED liability).

[127] *See Kuritzky*, 321 Ga. App. at 183-84, 740 S.E.2d at 679 (IIED requires "intentional or reckless conduct" even against university defendant).

[128] *See Mayorga*, 364 Ga. App. at 670, 870 S.E.2d at 520 (requiring that severe emotional distress be substantial and enduring to be actionable); O.C.G.A. § 51-12-6 (2020) (providing that damages are recoverable for mental pain and suffering when supported by evidence).

145.  Under Georgia law, Emory is vicariously liable for Dean Eley's tortious conduct through the doctrine of respondeat superior, as he was acting within the scope of his administrative authority at the School of Medicine and in furtherance of Emory's institutional business and policies.[129]

## V.    JURY TRIAL DEMANDED

The Plaintiff hereby demands a jury trial for all issues triable by a jury.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

A. Declare that Defendants' conduct constitutes unlawful intentional discrimination based on national origin in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.;

B. Declare that Defendants unlawfully retaliated against Plaintiff for engaging in protected activity in violation of Title VI and 42 U.S.C. § 2000d-7(a);

C. Declare that Defendants materially breached their contractual obligations to Plaintiff under Georgia law;

---

[129] *See Piedmont Hosp., Inc. v. Palladino*, 276 Ga. 612, 613, 580 S.E.2d 215, 217 (2003) (respondeat superior liability requires employee to act within the scope of employment and in furtherance of the employer's business).

D. Declare that Defendants denied Plaintiff procedural due process in violation of Georgia law;

E. Declare that Defendants' conduct constitutes intentional infliction of emotional distress under Georgia law;

F. Award compensatory damages in an amount to be determined at trial for lost educational opportunities, delayed career advancement, lost income, emotional distress, reputational harm, and other damages flowing from Defendants' unlawful conduct;

G. Award consequential damages for the reasonably foreseeable consequences of Defendants' violations;

H. Award punitive damages in an amount sufficient to punish Defendants' egregious conduct and deter similar unlawful behavior;

I. Order Defendants to rescind Plaintiff's suspension and reinstate her to good standing in the School of Medicine;

J. Order Defendants to expunge all records related to disciplinary proceedings arising from Plaintiff's protected activities;

K. Enjoin Defendants from pursuing disciplinary proceedings against Plaintiff based upon her protected expression;

L. Order Defendants to remove any barriers to Plaintiff's full participation in academic activities at Emory University;

52

M. Enjoin Defendants from retaliating against Plaintiff for filing this lawsuit or engaging in protected activity;

N. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, O.C.G.A. § 13-6-11, and other applicable law;

O. Award pre-judgment and post-judgment interest as permitted by law; and

P. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted this 4th day of August, 2025

/s/ Keon N. Grant
Keon Nicholas Grant
Georgia Bar No. 946800
Aaron Edward Butler
Georgia Bar No. 722335
**Council on American-Islamic Relations – Georgia**
P.O. Box 956263
Duluth, GA 30095
Telephone: 470.604.7877
kgrant@cair.com
abutler@cair.com

/s/ Jonathan Wallace
Jonathan Wallace
*Pro Hac Vice Forthcoming*
New York Bar No. 1733757
P.O. Box #728
Amagansett, NY 11930
Telephone: 917.359.6234
jonathan.wallace80@gmail.com

*Counsel for Plaintif*

53